# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF OREGON

| | |
|---|---|
| **UNITED STATES OF AMERICA**, | Case No. 3:11-cr-00101-SI |
| v. | **OPINION AND ORDER** |
| **KENNETH ROBERT MCVICKER III**, | |
| Defendant. | |

S. Amanda Marshall, U.S. Attorney, and Gary Y. Sussman and Kelly Alexandre Zusman, Assistant U.S. Attorneys, District of Oregon, 1000 S.W. Third Avenue, Suite 600, Portland, OR 97204. Attorneys for United States.

Krista M. Shipsey, 820 S.W. Second Avenue, Suite 275, Portland, OR 97204, and Lynne B. Morgan, Pacific Northwest Law LLP, 1420 World Trade Center, 121 S.W. Salmon Street, Suite 1420, Portland, OR 97204. Attorneys for Defendant.

**Michael H. Simon, District Judge.**

Kenneth R. McVicker III ("McVicker" or "Defendant"), a United States citizen,

challenges his indictment for producing and transporting child pornography while living abroad.

He argues that the statutes for which he has been indicted do not reach conduct that occurs

outside the territory of the United States; that venue in the District of Oregon is improper

because his conduct was not directed at the district; that his case should be dismissed because the

government lacks jurisdiction to prosecute him under the Rule of Specialty; and that statements

he made to U.S. officials in Belize after he was arrested by local authorities should be suppressed

PAGE 1 – OPINION AND ORDER

because they were obtained in violation of his rights under the United States Constitution. The Court held an evidentiary hearing on October 22-23, 2013. For the reasons that follow, the Court denies McVicker's motions.

## FINDINGS OF FACT

The superseding indictment charges that on or about February 6, 2011, McVicker "having previously been convicted of an offense involving the sexual abuse of a minor, knowingly transported or shipped child pornography . . . using any means or facility of interstate or foreign commerce, or in or affecting interstate or foreign commerce by any means, including by computer, which images of child pornography were accessed and downloaded in the District of Oregon," in violation of 18 U.S.C. § 2252A(a)(1) (the "transporting" charge). Dkt. 19 (Count One). It also charges that McVicker, on or about November 24, 2010, "knowingly and unlawfully employed, used, persuaded, induced, enticed, or coerced" a minor "to engage in sexually explicit conduct . . . for the purpose of producing visual depictions of such conduct" that were then "mailed, shipped, or transported using any means or facility of interstate or foreign commerce, or in or affecting interstate or foreign commerce, and were accessed and downloaded in the District of Oregon," in violation of 18 U.S.C. § 2251(a) (the "producing" charge). *Id* (Count Two).

Based on the evidentiary hearing held on October 22-23, 2013, the Court makes the following findings of fact:

1. The investigation of McVicker began in December 2010, when Immigration and Customs Enforcement ("ICE") agents executed a warrant in Vancouver, Washington to search the residence of Rick Carr ("Carr"). The ICE agents found that Carr was trading large volumes of child pornography. Because Carr's computer was up and running while the agents executed the search, they

discovered that Carr was using a file-sharing program to distribute images of child pornography. ICE agents used the file-sharing program to investigate electronic correspondence and exchanges with another U.S. Citizen, Seth Bekenstein.

2. The federal agents, with Carr's permission, assumed his identity and communicated with Bekenstein. Bekenstein repeatedly sent to an undercover ICE agent in Portland, Oregon links to images that he claimed were child pornography, including images allegedly produced by McVicker. Bekenstein provided passwords to open the encrypted links. Department of Homeland Security ("DHS") Special Agent James Mooney accessed and downloaded those images in the District of Oregon.

3. In his communications with the federal agents posing as Carr, Bekenstein identified a man named "Kenny" as one of the producing sources of child pornography, and explained that Kenny lived on the coast in Ecuador, was trusted by the community, taught at a local school, and had relocated to Ecuador after serving time in prison for child molestation charges in Maryland.

4. On one occasion when Bekenstein arrived in Portland, Oregon, he was arrested by ICE agents on charges of transporting and distributing child pornography. Afterwards, with Bekenstein's consent, Agent Mooney assumed Bekenstein's online identity "Seth Laver." Agent Mooney accessed Bekenstein's email accounts, reviewed emails allegedly sent from McVicker, and downloaded and discovered in the District of Oregon images of an Ecuadorean boy, approximately five years of age, that depicted child sexual abuse.

5.  On February 6, 2011, a contact of Bekenstein's known as "Padrino Padrino" or "Kenny" sent an email to Bekenstein, who was then living in Mexico. Federal agents identified "Padrino Padrino" as the online identity of McVicker. The email contained a link to an internet-based file-storage site, the server for which is located in the Netherlands. In a separate email, McVicker sent Bekenstein the password needed to access those files. The files contained images of child pornography, allegedly produced by McVicker in Ecuador.

6.  Bekenstein used an email account through Microsoft Live.com, which is based in Redmond, Washington. His email account is stored on servers in the United States and his emails traveled through servers in the United States, even while Bekenstein was in Mexico.

7.  Agent Mooney used emails sent between Bekenstein and McVicker to investigate the location from which the messages from McVicker were sent. In particular, Agent Mooney identified the originating internet protocol ("IP") address of an email from McVicker to Bekenstein on February 6, 2011. Thereafter, he used an online tool to "geolocate" the IP address. Agent Mooney discovered that Mcvicker's IP address was assigned to an internet service provider located in Ecuador, but not to a named individual. McVicker's emails were sent through a server located in Israel, which then traveled through several intermediary internet "hops," including servers, routers, and switches, and then eventually to a Microsoft-owned server located in the state of Washington.

8.  Agent Mooney separately analyzed the metadata in the photographs allegedly transferred from McVicker to Bekenstein. The metadata within the images

provided forensic, such as the type of camera used and the dates and times that the photographs were taken (according to the camera's internal clock). Agent Mooney's analysis established that the photographs were taken with the camera that was later seized from McVicker in Belize.

9. Agent Mooney identified emails in Bekenstein's account containing links to images depicting child sexual abuse. In some of these emails, Bekenstein asked McVicker to identify the name of the child depicted in the images. McVicker identified the male child depicted as "Kevin." In the District of Oregon, Agent Mooney downloaded images from the relevant emails containing hyperlinks to confirm their content and that they contained child pornography.

10. Agent Mooney communicated, using Bekenstein's email account with Bekenstein's consent, with McVicker for several days. During one of these communications, McVicker told Agent Mooney that McVicker was planning to leave Ecuador for Belize to work on a commissioned art project.

11. During the course of McVicker's email communications with Bekenstein and Carr, there is no evidence that McVicker attached to any email any computer files that actually contained child pornography. Instead, McVicker appears to have encrypted images of child pornography and downloaded or uploaded those images to a server outside of the United States. McVicker then sent emails containing hyperlinks to that server or those servers, and he sent in separate emails the password or passwords needed to open the encrypted files.

12. A grand jury indicted McVicker on March 2, 2011, and an arrest warrant for McVicker was issued. Thereafter and through INTERPOL, the United States

issued a "Red Notice" to seek the location and arrest of McVicker with a view

toward obtaining extradition or similar lawful action.

13. On March 17, 2011, McVicker was arrested in Belize both on the United States

warrant and on local immigration charges. McVicker had traveled to Belize on a

U.S. passport to assist a friend in painting a mural at a lodge on Long Caye, an

island off the cost of Belize, approximately 40 miles from Belize City, Belize.

Agent Paul Trachtenberg of the State Department's Diplomatic Security Service,

who was associated with the U.S. Embassy in Belize at the time, arrived at the

lodge with local police officers. Agent Trachtenberg approached McVicker and

asked him if he was "Kenny." When McVicker confirmed that he was, Agent

Trachtenberg told McVicker to put down his paint brush and stand up. According

to Agent Trachtenberg, the Belize authorities informed McVicker that he was

under arrest, placed him in handcuffs, and searched him. McVicker testified,

however, that it was Agent Trachtenberg who placed McVicker in handcuffs. This

is one of the few factual discrepancies, if not the only one, arising out of the

evidentiary hearing, and the Court accepts Agent Trachtenberg's testimony on

this point.

14. Agent Trachtenberg asked McVicker where he was staying, and McVicker replied

that he was staying in a room at the lodge. Agent Trachtenberg accompanied

McVicker while the Belize police officers searched McVicker's room and seized

his passport, camera, and computer data memory stick. In the continuous presence

of Agent Trachtenberg, McVicker was transported by boat by Belize law

enforcement authorities to the Belize City Jail.

15. Agent Trachtenberg did not read McVicker his *Miranda* rights. The Court finds

     that Trachtenberg did not ask McVicker any questions of substance other than

     those already noted, although he provided McVicker with an opportunity to make

     a "voluntary statement," which McVicker declined. After McVicker arrived at the

     Belize City Jail, he was questioned for approximately one to two hours by Belize

     police officers outside the presence of Agent Trachtenberg. Belize police officers

     asked McVicker whether he had produced any child pornography or otherwise

     abused any children while in Belize, which McVicker denied. Local law

     enforcement then held McVicker in the Belize City Jail for six days.

16. Conditions for McVicker in the Belize City Jail were unpleasant. McVicker was

     held in a small, empty cell without anything to sit on, without blankets, and

     without sanitation facilities. He did not receive any food or water during his first

     60 hours at the jail. According to McVicker, officers at the jail told him that if he

     were transferred to the Belize central prison, he would be sexually assaulted and

     likely killed. There is no evidence that any such statement was made in the

     presence of Agent Trachtenberg or that Agent Trachtenberg was aware that such

     statements were made to McVicker by Belizean police. While in the Belize City

     Jail, McVicker observed several other prisoners whom McVicker believed were

     or may have been tortured or otherwise physically abused by Belizean authorities.

17. On March 21, 2011, four days after McVicker's arrest, Agent Mooney and fellow

     DHS Special Agent Josh Findley arrived in Belize from Portland, Oregon, to

     interview McVicker at the Belize City Jail. Agent Trachtenberg was also present

     during the questioning. In addition, a Belizean police officer named "Gino" was

present at the beginning of the questioning, but he left quite early after McVicker asked the Agents Mooney and Findley to ask the Belizean police officer to leave the room. The subject matter and details of the Belize police officer's questioning on March 17, 2011, was not disclosed to Agents Mooney and Findley. Agents Mooney and Findley tape-recorded their March 21, 2011 interrogation.

18. Shortly before the interview, McVicker received food and water from the Belizean jailers. At the interview, McVicker was dressed in civilian clothing and looked somewhat disheveled. He was not handcuffed. There were no outward signs that McVicker had been physically abused or tortured by his Belizean jailers. In addition, McVicker appeared lucid and hydrated. McVicker was able to understand both what the agents were saying to him, and the agents understood what McVicker was saying to them. At no time did McVicker appear to be delusional. McVicker's statements to the agents were responsive to the questions that were asked of him. At no point during the interview did anyone have a weapon drawn, use or threaten force against McVicker, or raise their voice. The agents were polite, respectful, and non-confrontational. The agents gave McVicker only accurate information and McVicker indicated that he understood his rights. In fact, McVicker expressly told the agents the he would answer their questions truthfully but not necessarily answer all of their questions. McVicker appears to be of above-average intelligence and has prior experience with the criminal justice system.

19. After Agents Mooney and Findley introduced themselves to McVicker, the

interview began. McVicker was informed of his *Miranda* rights. The following

evidence of that interview is based on the transcript of the tape-recording:

SA Findley:          Jim and I both work for the U.S. Department of Homeland Security. We're down here in Belize to—we're told we are to come talk to you and we're going to have to make some decisions about where you go from here and what happens. You've been told that there is an arrest warrant for you in the U.S.?

McVicker:          Yes, sir.

SA Findley:          Okay. Before we start talking and I'll explain the investigation and how we got—there . . . being an arrest warrant for you, I want you to know that you have the right to remain silent, that anything you say can be used against you in a court or other proceedings. You have the right to consult an attorney before making any statement or answering any questions. You have the right to have an attorney present with you during questioning. If you cannot afford an attorney, one will be appointed for you before any questioning if you wish. If you decide to answer questions now, you still have the right to stop the questioning at any time or stop the questioning for the purpose of consulting an attorney. So I want to kind of add two things to that for you. We will talk to you about how the investigation got here and stuff like that, and if at that point you decide that you don't want to say anything else, that's fine. You can stop it at any time. That's an important thing. The second thing that is really important is if you have made any statements to anybody else—the local police. I don't know if you were interrogated by them or anything like that. Don't take into account any of those things you've said if you are making your decision on whether or not you would like to talk to us about why we're here. You know, why you make your decision based on you, right now, on anything that you may have said to someone else under duress or anything like that. And if that had

|                |                                                                                      |
|----------------|--------------------------------------------------------------------------------------|
|                | happened that wouldn't be used against you. Does that make sense?                     |
| McVicker:      | Yes, sir.                                                                             |
| SA Findley:    | Okay. Um . . .                                                                        |
| McVicker:      | Um . . . could I? One question                                                       |
| SA Findley:    | Yeah, anytime you have a question feel free.                                          |
| McVicker:      | If I do want an attorney, is there one here I can use that I can get, or—?            |
| SA Findley:    | No. So if you'd like an attorney, then if you were transported back to the U.S. and brought into court, then you'd get an attorney then. We don't have any authority under the laws here in Belize to provide you an attorney or anything like that. You're currently in custody on immigration violations in Belize and my understanding is that you have committed no other criminal activity here. So those things are completely under their authority and care. |
| McVicker:      | So it's kind of strange, though, because they have a sign on the wall that says that if anyone has to be detained under their system and you must be brought up on charges—you must be charged within 48 hours. I've been in this rat hole for four or five days now. I haven't had a shower. I went to the bathroom one time. They let me go to the bathroom one time. You can see I haven't shaved. I'm smelly. I don't know. I mean, you guys probably like it I'm in this situation. |
| SA Findley:    | Not at all. That's not our goal at all. But we do have to make the—we don't have the ability to arrest, detain, or do anything with you in Belize, nor do we have the authority or the ability to force them to treat you any differently than they would any other citizen. |
| SA Mooney:     | Yeah, we hopped on the first plane we could to come down. Once—you know, I think the government bureaucracy—it takes a while to get things rolling. |

PAGE 10 – OPINION AND ORDER

| | |
|---|---|
| SA Findley: | And unfortunately for us, we probably could have been down here last week, but it corresponds with the Spring Break in the U.S. and all the flights were booked, so we couldn't get out. With that being said, decisions are going to have to be made. I know that there is some interest by the authorities in Ecuador. I don't know if there is any further interest in the authorities here in Belize, but decisions are going to have to be made as to who takes precedence and all those things. Does that make sense? |
| McVicker: | Yes. |
| SA Findley: | So we'd like to talk to you and we'd like to get you back to the U.S. or whatever. You would get a shower and get to go back to the bathroom, in a toilet by yourself and stuff like that. So our goal is to get you—to get you back there. If you want to talk to us today and we'll figure out why you're here and hopefully we can make that happen. Okay? |
| McVicker: | Who is this guy? Does this guy in white have to be here? |
| SA Trachtenberg: | Umm . . . he is with the Belize Police Department so um . . . . |
| McVicker: | If we're going to toughly [*sic*] [thoroughly] discuss my charges, I would prefer . . . |
| SA Findley: | prefer to be? |
| McVicker: | not having everyone as possible |
| SA Trachtenberg: | (to Officer Gino) Do you need to be here? |
| Belize Officer Gino: | Well . . . . [INAUDIBLE] |
| SA Trachtenberg: | (to Officer Gino) For your case, I'm sorry, do you have to be here? |
| Belize Officer Gino: | [INAUDIBLE] |
| SA Trachtenberg: | (to Officer Gino) Uh yeah . . . . |
| SA Findley: | (to Officer Gino) If you'd like to come back in and talk to us about anything— |

PAGE 11 – OPINION AND ORDER

| | |
|---|---|
| SA Trachtenberg: | (to Officer Gino) Yeah, yeah. |
| SA Findley: | (to Officer Gino) I don't have any problem with that either, but— |
| SA Trachtenberg: | (to Officer Gino) Yeah. |
| SA Mooney: | (to SA Trachtenberg) We don't want to upset the relationship |
| SA Findley: | Trying to . . . . |
| McVicker: | Just for my own safety. Because— |
| SA Findley: | He hears something specific about what the charges are, I understand. |
| McVicker: | I'm in a really terrible rat hole there and everybody there thinks that I'm there for being in the country illegally |
| SA Findley: | OK |
| McVicker: | because I was working on a tourist visa. |
| SA Findley: | Right. |
| McVicker: | But I just worry about [0:5:51.8 INAUDIBLE] |
| SA Findley: | Yeah. Again, our—believe me Kenny, we don't want anything bad to happen to you in this facility or any other facility. Umm . . . Like I said, we believe very strongly in the American way of justice and that is to treat people fairly with respect to everybody. So we're not looking to put you in a worse situation than you already are. I also want to let you know that we got a little recorder that's going right there, so that's just so that I don't have to take notes so it doesn't distract me. There's no— it's not a question of which words I use or you use. It's sometimes like when I write a report, I paraphrase. So it just allows us to have an exact record. Is that okay? |
| McVicker: | Yes, sir. |
| SA Findley: | Ok. And if for some reason you wanted it off, you could let me know that, too, and I can turn it off. |

PAGE 12 – OPINION AND ORDER

| | |
|---|---|
| McVicker: | That's fine. |
| SA Findley: | It's one of those things that is kind of more for your safety and protection and my safety and protection. So the arrest warrant—what do you know about that? Out of the U.S.? |
| McVicker: | I know absolutely nothing |
| SA Findley: | Ok |
| McVicker: | I asked Paul three or four times and he wouldn't tell me, so I have no idea |
| SA Findley: | Okay. The arrest warrant out of the U.S. is for transportation of child pornography. Even if you are in another country and you send an email or a file that is an action and it's downloaded by someone in the U.S., that's the jurisdiction for that crime. It is also a crime for an American citizen to travel to a foreign country and engage in a sex act umm . . . with a person that it would be a crime to engage in that sex act with a U.S. resident. Okay? So does that give you a better sense of why we're here? |

Kenny McVicker Interview Transcript, Government Exhibit 2 ("Gov't Ex. 2") at 1-4.

20. The interview continued for one hour and 47 minutes. During the interview, McVicker admitted to taking photographs of young boys whom he had abused in Ecuador and sending by email to individuals in different countries, including Bekenstein, links to those photographs. McVicker knew that Bekenstein lived in Mexico, but denies knowledge of Bekenstein's travels to the United States, including travel to Oregon. McVicker seeks to suppress the statements that he made during this interview.

21. On March 23, 2011, six days after his arrest, Belize officials ordered McVicker out of Belize as a "prohibited immigrant" under the immigration law of Belize. Agents Findley and Mooney had no notice of the Belize officials' immigration

decision before it was made. McVicker was accompanied back to the United

States by Agents Findley and Mooney. McVicker entered the United States in

Atlanta, Georgia, where he was placed under arrest on the outstanding warrant.

22. The Court finds credible the testimony of all the witnesses that testified at the

October 22, 2013, evidentiary hearing and resolves any disputed facts as set forth

above.

## CONCLUSIONS OF LAW

The following four motions are pending before the Court: (1) McVicker's Motion to

Dismiss Superseding Indictment for Defective Jurisdiction, brought under Federal Rule of

Criminal Procedure 12(b)(3)(A) (defect in instituting the prosecution) and 12(b)(3)(B) (defect in

indictment, including failure to invoke the court's jurisdiction or to state an offense) (Dkt. 52);

(2) McVicker's Motion to Dismiss for Lack of Venue, brought under Federal Rule of Criminal

Procedure 12(b)(3)(A) (defect in instituting the prosecution) (Dkt. 54); (3) McVicker's Motion to

Dismiss Case for Violation of the Rule of Specialty (Dkt. 103); and (4) McVicker's Motion to

Suppress Statements of Defendant (Dkt. 50). The Court addresses each in turn.

**A.  Motion to Dismiss for Lack of Jurisdiction**

On a defendant's pretrial motion to dismiss, the Court assumes the government can prove

what it has alleged in the indictment. *United States v. Milovanovic*, 678 F.3d 713, 717 (9th Cir.

2012) (en banc); *United States v. Jensen*, 93 F.3d 667, 669 (9th Cir. 1996). The government

bears the burden of establishing that this Court has jurisdiction. *See United States v. Marks*, 530

F.3d 799, 810 (9th Cir. 2008). McVicker argues that the statutes under which he is indicted do

not apply to conduct outside the territory of the United States and that he thus cannot be

convicted of the crimes charged. The Court rejects McVicker's argument.

"Generally, there is no constitutional bar to the extraterritorial application of United States penal laws." *United States v. Felix-Gutierrez*, 940 F.2d 1200, 1204 (9th Cir. 1991). The extraterritorial reach of a criminal statute is thus a question of statutory interpretation. *United States v. Thomas*, 893 F.2d 1066, 1068 (9th Cir. 1990); *see also United States v. Bowman*, 260 U.S. 94, 97 (1922). To determine whether a criminal statute has extraterritorial application, the Court considers two questions: first, it examines "the statute's text for any indication that Congress intended it to apply extraterritorially," and second, it examines whether such an application would comply with principles of international law. *United States v. Hill*, 279 F.3d 731, 739 (9th Cir. 2002); *see also Bowman*, 260 U.S. at 97-98 ("The necessary locus, when not specially defined, depends upon the purpose of Congress as evinced by the description and nature of the crime and upon the territorial limitations upon the power and jurisdiction of a government to punish crime under the law of nations.").

## 1. Congressional Intent

Congress must "make clear its intent to give extraterritorial effect to its statutes." *United States v. Davis*, 905 F.2d 245, 248 (9th Cir. 1990). That intent, however, may be implicit in the content and context of the statute as a whole. *See Felix-Gutierrez*, 940 F.2d at 1204 (noting that congressional intent that penal statute apply extraterritorially may be express or implied); *see also Morrison v. Nat'l Austl. Bank Ltd.*, 130 S. Ct. 2869, 2883 (2010) (in determining whether statute is intended to apply extraterritorially, court may consult context of the statute). Particularly for criminal statutes, courts may infer Congress's intent that a statute apply extraterritorially "from the nature of the offenses and Congress' other legislative efforts to

eliminate the type of crime involved." *Thomas*, 893 F.2d at 1068 (quoting *United States v. Baker*, 609 F.2d 134, 136 (5th Cir. 1980)) (internal quotation mark omitted).[1]

### a. 18 U.S.C. § 2251(a)

In *Thomas*, the Ninth Circuit held that 18 U.S.C. § 2251(a) applies to acts committed outside the United States. 893 F.2d at 1069. Although § 2251(a) does not explicitly state that it applies to extraterritorial conduct, the Ninth Circuit inferred that this was Congress's intent because "Congress has created a comprehensive statutory scheme to eradicate sexual exploitation of children." *Id.* at 1068. Section 2251(a) is "part of that scheme," and "[p]unishing the creation of child pornography outside the United States that is actually, is intended to be, or *may reasonably be expected to be* transported in interstate or foreign commerce is an important enforcement tool." *Id.* at 1068-69 (footnote omitted) (emphasis added).[2] The Ninth Circuit has since reaffirmed this holding in a memorandum opinion. *United States v. Nelson*, 61 F.3d 914, 1995 WL 433960, at *1 (9th Cir. July 21, 1995) ("[S]ection 2251(a) applies to acts whether or not committed in the United States.").

---

[1] In the civil context, the Supreme Court has articulated a presumption against the extraterritorial application of statutes that can only be overcome by a clear indication of congressional intent. *See Morrison*, 130 S. Ct. at 2877-78. The last time the Supreme Court addressed the extraterritorial reach of *penal* statutes, however, it held that "the same rule of interpretation should not be applied to criminal statutes which are, as a class, not logically dependent on their locality for the government's jurisdiction . . . ." *Bowman*, 260 U.S. at 98. The United States Courts of Appeal have applied *Bowman* to the interpretation of criminal statutes with varying degrees of liberality. *See generally* Zachary D. Clopton, Bowman *Lives: Extraterritorial Application of U.S. Criminal Law after* Morrison v. National Australia Bank, 67 N.Y.U. Ann. Surv. Am. L. 137 (2011). This Court is bound by the Ninth Circuit's broad application of the *Bowman* exception in criminal cases, as well as by the Ninth Circuit's specific holding in *Thomas*, discussed below.

[2] As the Ninth Circuit clarified, "foreign commerce" refers to commerce between the United States and a foreign nation. *See Thomas*, 893 F.2d at 1069 n.2.

McVicker argues that § 2251(a) does not explicitly apply to extraterritorial conduct. He acknowledges the Supreme Court's holding in *Bowman* that Congress need not expressly state its intent for criminal statutes to apply extraterritorially when the statutes "are, as a class, not logically dependent on their locality for the government's jurisdiction, but are enacted because of the right of the government to defend itself against obstruction, or fraud wherever perpetrated, especially if committed by its own citizens, officers, or agents." *Bowman*, 260 U.S. at 98. As McVicker argues, this phrasing in *Bowman* can be read narrowly to refer only to statutes invoking the "protective principle" of jurisdiction under international law.

The protective principle recognizes that sovereign states may punish certain offenses that threaten national security or the integrity of the state, no matter where the offense is committed or by whom. *See Restatement (Third) of Foreign Relations Law* § 402, cmt. f (1987). Adopting this narrow reading of *Bowman*, the U.S. Court of Appeals for the Armed Forces held that 18 U.S.C. § 2252A and similar statutes related to child pornography do not fall under the protective principle, are thus not covered by the *Bowman* exception, and must therefore include an express indication of their extraterritorial reach if they are to be applied to conduct outside the United States. *United States v. Martinelli*, 62 M.J. 52, 57 (C.A.A.F. 2005). The Ninth Circuit, however, has adopted a broader reading of *Bowman*, as the *Martinelli* court itself recognized. *See Martinelli*, 62 M.J. at 58 (disagreeing with the Ninth Circuit's approach to this question); *see also* Zachary D. Clopton, Bowman *Lives: Extraterritorial Application of U.S. Criminal Law after* Morrison v. National Australia Bank, 67 N.Y.U. Ann. Surv. Am. L. 137, 165-72 (2011) (discussing how the various United States Courts of Appeal have differed in their application of *Bowman*). This Court must apply the Ninth Circuit's holding in *Thomas* that § 2251(a) applies to conduct outside the territory of the United States. *See Nelson*, 1995 WL 433960, at *1.

The Court also rejects McVicker's argument that 18 U.S.C. § 2251(c) requires a more limited interpretation of the jurisdictional reach of § 2251(a). Section 2251(c), added by Congress in 2003, largely proscribes the same conduct as § 2251(a), except that it specifically targets conduct "outside of the United States, its territories or possessions." Also, the *mens rea* element for § 2251(a) "does not require knowledge of the interstate nature of the materials used to produce the sexually explicit images." *United States v. Sheldon*, --- F.3d ---, 2013 WL 5273101, at *2 (9th Cir. Sept. 19, 2013). Within § 2251(a) there are three independent jurisdictional clauses, only the first of which requires the defendant to "know[] or ha[ve] reason to know" that the pornography will be transmitted in or affect interstate commerce (or was produced or transmitted using materials transported in or affecting interstate or foreign commerce. *Id.* Conversely, § 2251(c) requires the defendant to *intend* that the pornography be transported to the United States or to actually transport it to the United States himself. *Compare* 18 U.S.C. § 2251(a) *with id.* § 2251(c)(2)(A)-(B).

Congress adopted § 2251(c) to "stop efforts by producers of child pornography to avoid criminal liability based on the fact that the child pornography was produced outside of the United States, but intended for use inside the United States," and it cited to *Thomas* as an example of such efforts to evade liability. H.R. Conf. Rep. No. 108-66, at 62-63 (2003). That is, Congress appeared to agree with the Ninth Circuit that § 2251 should apply extraterritorially and sought to clarify the scope of the statute in order to assist prosecutions of producers of child pornography. If Congress instead meant to *replace* the extraterritorial reach of § 2251(a) with § 2251(c), it would be odd for Congress to recognize *Thomas* and yet not restrict or amend the scope of § 2251(a) itself. "It is, of course, a cardinal principle of statutory construction that repeals by implications are not favored." *Radzanower v. Touche Ross & Co.*, 426 U.S. 148, 154 & n.9

PAGE 18 – OPINION AND ORDER

(1976) (quoting *United States v. United Cont'l Tuna Corp.*, 425 U.S. 164, 168 (1976), and

collecting cases). For these same reasons, the Eleventh Circuit has twice held that § 2251(a)

continues to apply extraterritorially despite the adoption of § 2251(c). *See United States v.*

*Frank*, 599 F.3d 1221, 1232-33 (11th Cir. 2010); *United States v. Kapordelis*, 569 F.3d 1291,

1306 n.14 (11th Cir. 2009). And the Ninth Circuit in its unpublished *Nelson* decision rejected a

similar argument on similar grounds, holding that a new statute expressly prohibiting the foreign

production of child pornography did not nullify the Ninth Circuit's binding decision in *Thomas.*

*See Nelson*, 1995 WL 433960, at *1 (rejecting defendant's argument that Congress's enactment

of what is now 18 U.S.C. § 2260 "indicated its belief that section 2251 did not extend

extraterritorially").

McVicker argues that the extraterritorial application of § 2251(a) renders § 2251(c)

redundant. That is not necessarily so. The Court notes that §2251(c), with its focus on the

perpetrator's intent to target the United States' market, tracks more closely the "effects principle"

of jurisdiction under international law. *See Restatement (Third) of Foreign Relations Law* § 402,

cmt. d.[3] In light of Congress's extensive legislation in this field, it is reasonable to conclude that

Congress intended prosecutors to be able to use the broader provisions of § 2251(a) whenever

possible but to use § 2251(c) when the application of § 2251(a) might conflict with principles of

---

[3] "Jurisdiction with respect to activity outside the state, but having or intended to have substantial effect within the state's territory, is an aspect of jurisdiction based on territoriality." *Restatement (Third) of Foreign Relations Law* § 402, cmt. d. For this reason, the effects principle is sometimes referred to as "objective territoriality." *See United States v. Vasquez-Velasco*, 15 F.3d 833, 839-41 (9th Cir. 1994).

international law—for example, when the United States could not assert jurisdiction based on the defendant's nationality, as it can here.[4]

### b.   18 U.S.C. § 2252A(1)(a)

Turning to the other count in the superseding indictment (Count One), the Court is aware of no appellate court decision other than from the United States Court of Appeals for the Armed Forces in *Martinelli* that has considered whether 18 U.S.C. § 2252A(a)(1) applies extraterritorially. *Martinelli* held that it did not, but as explained above, *Martinelli* is not consistent with Ninth Circuit precedent. In the case at bar, the Court relies instead on the Ninth Circuit's reasoning in *Thomas* regarding § 2251(a), which applies with equal force to § 2252A(a)(1). Like § 2251(a), § 2252A(a)(1) is part of Congress's "comprehensive statutory scheme to eradicate sexual exploitation of children," which includes the proscription of the "transportation, mailing, and receipt of child pornography." *Thomas*, 893 F.2d at 1068-69. If § 2251(a) applies extraterritorially, as the Ninth Circuit has held that it does, then § 2252A(a)(1) must apply extraterritorially as well. Further, if Congress is concerned with diminishing the domestic market for child pornography and sexual exploitation, halting the transportation of child pornography *into* the United States would be at least as important as preventing its transportation *out of* the United States; the latter is assuredly covered by the statute, but the former purpose would be thwarted if § 2252A(1)(a) did not have extraterritorial reach. *Cf. United States v. Wright*, 625 F.3d 583, 600 (9th Cir. 2010) (in amending § 2252A(a)(1) in 2007, Congress "chose to regulate to the outer limits of its Commerce Clause authority."). In sum, the Court holds that Congress intended both statutes charged in the superseding indictment to apply extraterritorially.

---

[4] Compliance with principles of international law and the application of jurisdiction based on nationality are discussed further in Section A(2) below.

### 2.   Principles of International Law

Turning to the second question, the Court holds that application of these statutes to

McVicker's conduct outside of the United States is consistent with principles of international

law. This second question reflects the *Charming Betsy* canon,[5] under which courts will not

"unnecessarily construe a congressional statute in a way that violates international law." *Thomas*,

893 F.2d at 1069; *see also, e.g.*, *Vasquez-Velasco*, 15 F.3d at 839. It is axiomatic that

"[i]nternational law permits a country to apply its statutes to extraterritorial acts of its nationals."

*Thomas*, 893 F.2d at 1069; *accord Hill*, 279 F.3d at 739-40.[6] McVicker is a U.S. citizen.

Application of U.S. penal statutes to his conduct abroad therefore complies with traditional

principles of international law.[7]

### 3.   Additional Arguments

McVicker raises several additional arguments for why the Court should dismiss the

superseding indictment for lack of jurisdiction. First, McVicker argues that application of either

---

[5] *See The Charming Betsy*, 2 Cranch 64 (1804).

[6] The other traditional bases for the exercise of prescriptive jurisdiction are territoriality (including the effects principle/objective territoriality discussed above), the protective principle (discussed above), passive personality (*i.e.*, when the victim is a national of the legislating state), and universal jurisdiction. *See Restatement (Third) of Foreign Relations Law* §§ 402, 404. Territoriality and nationality are the most accepted and least controversial grounds for the exercise of jurisdiction under international law. *See Vasquez-Velasco*, 15 F.3d at 840 n.5.

[7] Under the approach of the *Restatement (Third) of Foreign Relations Law*, even if one of the heads of jurisdiction traditionally recognized under international law is applicable, its exercise may nonetheless violate international law if it would be "unreasonable." *See id.* § 403. The Ninth Circuit applied this "reasonableness" test in *Vasquez-Velasco*. 15 F.3d at 840-41 & n.6. The exercise by the United States of jurisdiction over its nationals accused of producing and transporting child pornography is not unreasonable under the factors listed in RESTATEMENT § 403(2), in particular factors (b) (nationality of perpetrator) and (c) (importance of regulation of child pornography to the United States and the broadly accepted desirability of preventing the sexual exploitation of children). *See* RESTATEMENT (THIRD) OF FOREIGN RELATIONS LAW § 403(2).

§ 2251(a) or § 2252A(a)(1) to his conduct abroad would violate his Fifth Amendment right to due process. "In order to apply extraterritorially a federal criminal statute to a defendant consistently with Due Process, there must be a sufficient nexus between the defendant and the United States . . . so that such application would not be arbitrary or fundamentally unfair." *Davis*, 905 F.2d at 248-49 (citation omitted). It is a "longstanding principle that citizenship alone is sufficient to satisfy due process concerns." *United States v. Clark*, 435 F.3d 1100, 1108 (9th Cir. 2006) (citing *Blackmer v. United States*, 284 U.S. 421, 436 (1932) and *United States v. Corey*, 232 F.3d 1166, 1179 n.9 (9th Cir. 2000)). McVicker is a U.S. citizen, and application of U.S. law to his conduct abroad is neither arbitrary nor fundamentally unfair. *Cf. Thomas*, 893 F.2d at 1068 (noting, even though not raised as an argument by the defendant, that prosecution under § 2251(a) for extraterritorial acts would not deny a U.S. citizen due process).

Similarly misplaced is McVicker's argument that the Court should apply the cannon of constitutional avoidance to interpret these statutes narrowly. The constitutional question identified by McVicker—the extent of Congress's power to legislate under the Commerce Clause—is incorporated into the elements of the crimes charged: at trial, the government will have to prove that McVicker's conduct affected foreign commerce. There is no blanket constitutional bar to the extraterritorial application of U.S. criminal statutes. *Felix-Gutierrez*, 940 F.2d at 1204.

Finally, McVicker argues that the government will be unable to prove that the alleged conduct affected foreign commerce (*i.e.*, commerce between the United States and a foreign country) because: (i) all that McVicker sent to Bekenstein, through the Microsoft servers located in the United States, was a link and a password; and (ii) McVicker did not know or consent to the later downloading of files by others from within the United States. The government argues that

McVicker had reason to know that the images at issue would end up in the United States because he had made the images available to several people, including Bekenstein, and he knew that Bekenstein was traveling to Oregon. *Cf. Thomas*, 893 F.2d at 1069 (Section 2251(a) intended to reach the creation of pornography outside the United States that "may reasonably be expected to be transported in interstate or foreign commerce"). The Court does not address this argument at this stage because it holds that the matter is an improper subject of a Rule 12(b) motion.

In a criminal case, "[a] motion to dismiss is generally 'capable of determination' before trial 'if it involves questions of law rather than fact.'" *United States v. Nukida*, 8 F.3d 665, 669 (9th Cir. 1993) (quoting *Untied States v. Shortt Accountancy Corp.*, 785 F.2d 1448, 1452 (9th Cir. 1986)). In resolving such a motion, the Court "may make preliminary findings of fact necessary to decide the legal questions presented by the motion," but it must be careful when doing so not to invade the province of the jury. *Id.* For this reason, "[i]f the pretrial claim is substantially founded upon and intertwined with evidence concerning the alleged offense, the motion falls within the province of the ultimate finder of fact and must be deferred." *Id.* (quoting *Shortt*, 785 F.2d at 1452). The Ninth Circuit has discouraged the use of evidentiary hearings on motions to dismiss indictments because of the risk that the motion will turn into a summary judgment proceeding, which is impermissible in the criminal context. *See United States v. Boren*, 278 F.3d 911, 914 (9th Cir. 2002); *Jensen*, 93 F.3d at 669.

As did the defendant in *Nukida*, McVicker argues that the government cannot prove his conduct affected foreign commerce, which is a material element of the charged offenses. "Inasmuch as [McVicker's] arguments . . . challenge[] the government's ability to prove that [his] actions affected commerce, [his] motion to dismiss amount[s] to a premature challenge to the sufficiency of the government's evidence tending to prove a material element of the offense."

*Nukida*, 8 F.3d at 669-70. To resolve McVicker's legal arguments, the Court would have to make findings of fact that are intertwined with the questions of culpability that the jury must resolve at trial. This it cannot do.[8] The distinction between a pretrial motion to dismiss and a post-trial challenge to the sufficiency of the evidence also distinguishes *United States v. Weingarten*, 632 F.3d 60 (2d Cir. 2011), on which McVicker relies.[9]

For these reasons, the Court denies the motion to dismiss for lack of jurisdiction.

### B.  Motion to Dismiss for Lack of Venue

McVicker also moves to dismiss the indictment under Federal Rule of Criminal Procedure 12(b)(3)(A) (defect in instituting the prosecution) for lack of venue in the District of Oregon. It is the government's burden to establish proper venue by a preponderance of the evidence. *See United States v. Chi Tong Kuok*, 671 F.3d 931, 937 (9th Cir. 2012). "The

---

[8] Although McVicker brought this motion under Rule 12(b)(3)(A) and (B), the Court notes that the superseding indictment, which closely tracks the statutory text, is not facially defective. The argument that the government cannot establish the foreign commerce nexus element would most appropriately be brought under Rule 12(b)(2), which allows a defendant to "raise by pretrial motion any defense, objection, or request that the court can determine *without a trial of the general issue*." Fed. R. Crim. P. 12(b)(2) (emphasis added). Because McVicker is challenging the government's ability to prove a material element, the Court cannot resolve the dispute before the trial on the merits of McVicker's guilt or innocence.

[9] On a post-conviction appeal challenging the sufficiency of the evidence, the Second Circuit in *Weingarten* determined that travel between two countries *not* including the United States could not constitute "travel[] in foreign commerce," a material element to the child sexual exploitation crime for which Weingarten was convicted. *Id.* at 67 (quoting 18 U.S.C. § 2423(b)). The court in that case did not address the problem this Court would face if it attempted to evaluate the government's evidence of nexus *before* trial. Notably, the Second Circuit also commented "that the issue of statutory construction that [*Weingarten*] presents would be substantially different if § 2423(b) prohibited travel . . . where such travel *affects* foreign commerce" instead of just prohibiting "travel *in* foreign commerce." *Id.* at 70. With 18 U.S.C. §§ 2251(a) and 2252A(a)(1), Congress chose the broader "affecting foreign commerce" wording. *See Wright*, 625 F.3d at 592 ("Where Congress uses the phrases 'affecting commerce' or 'involving commerce,' it signals an intent to exercise its commerce power to the full." (quotations and alterations omitted)).

sufficiency of the evidence to justify a finding on venue . . . is a question of law for the court."
*United States v. Lukashov*, 694 F.3d 1107, 1120 (9th Cir. 2012).

As the Ninth Circuit recently confirmed, "[t]he government must prosecute an offense in a district where the crime was committed," pursuant to the Constitution, the Sixth Amendment, and Federal Rule of Criminal Procedure 18. *United States v. Gonzalez*, 683 F.3d 1221, 1224 (9th Cir. 2012) (citing U.S. Const. art. III, § 2, cl. 3). When a crime begins in one place and ends in another, however, identifying the district "where the crime was committed" presents more subtle issues. For such "continuing offenses," Congress has established a special venue rule:

> Except as otherwise expressly provided by enactment of Congress, any offense against the United States begun in one district and completed in another, or committed in more than one district, may be inquired of and prosecuted in any district in which such offense was begun, continued, or completed.
>
> Any offense involving the use of the mails, *transportation in interstate or foreign commerce*, or the importation of an object or person into the United States is a continuing offense and, except as otherwise expressly provided by enactment of Congress, may be inquired of and prosecuted in any district from, through, or into which such commerce, mail matter, or imported object or person moves.

18 U.S.C. § 3237(a) (emphasis added). Both § 2251(a) and § 2252A(a)(1) proscribe continuing offenses. *See Kapordelis*, 569 F.3d at 1308 (discussing § 2251(a)); *cf. United States v. Moncini*, 882 F.2d 401, 403 (9th Cir. 1989) (discussing § 2252). McVicker focuses his argument on where the alleged offenses were "begun, continued, or completed," but it is the second paragraph of § 3237(a) that applies to this case. Furthermore, in analyzing the question of venue, the Court considers the "conduct constituting the offense (the nature of the crime) and then the discern[s] the location of the commission of the criminal acts." *Lukashov*, 694 F.3d at 1120 (citing *United States v. Rodriguez-Moreno*, 526 U.S. 275, 279 (1999)). Pursuant to *Moncini*, the second paragraph of § 3237(a) may be used to establish venue under § 2252. 882 F.2d at 403. When

PAGE 25 – OPINION AND ORDER

Special Agent Mooney downloaded files from Bekenstein's email account in the District of Oregon, the child pornography allegedly produced and sent by McVicker moved into this district. This evidence is sufficient to establish jurisdiction under the second paragraph of § 3237(a). *See Kuok*, 671 F.3d at 937-38 (holding that an undercover government agent's activities can be part of the conduct that forms an offense for purposes of venue).

It does not matter whether McVicker knew or should have known that Bekenstein would travel to Oregon and download the images there. "Simply put, section 3237(a) does not require foreseeability to establish venue for a continuous offense." *Gonzalez*, 683 F.3d at 1226; *see also United States v. Angotti*, 105 F.3d 539, 545 (9th Cir. 1997) (holding venue was established even though the defendant claimed he could not have foreseen where a coconspirator's overt act would occur). It also does not matter that the conduct establishing venue was initiated by a law enforcement officer. In *Kuok*, the Ninth Circuit held that venue was proper under § 3237(a) when it was based entirely on an undercover agent's decision to withdraw the defendant's money transfer from a bank in the district, even though the defendant had never had any contact with the district or knew that his money order would be cashed there. *See* 671 F.3d at 937-38. As long as "part of the conduct that formed the offense" occurred in the District of Oregon, "even if that conduct was performed by an undercover government agent," venue here is proper. *Id.* at 938. Of course, the government must still prove at trial that venue is proper. *See, e.g.*, *Jensen*, 93 F.3d at 669 n.2. The Court's holding today is based primarily on the allegations in the indictment and does not prejudge any finding of fact that the jury might make. *See id.* at 669.

Because venue is properly asserted under 18 U.S.C. § 3237(a), the Court does not reach McVicker's argument under 18 U.S.C. § 3238 that he should be prosecuted in the district into which he was first brought after his arrest. That statute only applies when venue is not otherwise

PAGE 26 – OPINION AND ORDER

proper in any district. The Court also rejects McVicker's *forum non conveniens* argument as a grounds for dismissal. If McVicker wishes to argue that venue in this district is inconvenient or burdensome, he may move to transfer to another U.S. judicial district. *See* Fed. R. Crim. P. 21(b); *Gonzalez*, 683 F.3d at 1227. Regardless of McVicker's preference to be prosecuted in Ecuador, the Court cannot transfer the case to a non-U.S. court, and dismissal of the case is not an available option. The United States, as a sovereign nation, has exercised its powers to indict and prosecute McVicker. Ecuador, as a sovereign nation, may do the same. McVicker does not get to choose one prosecution over the other, and he may well face both.

For these reasons, the Court denies the motion to dismiss for lack of venue.

## C.  Motion to Dismiss Case for Violation of the Rule of Specialty

McVicker also moves to dismiss this case under the Rule of Specialty, which provides that a criminal defendant brought within the jurisdiction of the United States by virtue of an extradition treaty can only be tried for the specific offense upon which he was extradited. *United States v. Rauscher*, 119 U.S. 407, 424 (1886); *see also United States v. Van Cauwenberghe*, 827 F.2d 424, 428 (9th Cir. 1987). The government responds that the Rule of Specialty only applies to cases where an actual, or formal, extradition has occurred, which is not the case here. The Court agrees.

The Rule of Specialty is a doctrine grounded in international comity and "prohibits the requesting nation from prosecuting the extradited individual for any offense other than that for which the surrendering state agreed to extradite." *Van Cauwenberghe*, 827 F.2d at 428 (citation and internal quotation marks omitted). These comity principles are based on the fact that "surrender of the defendant requires the cooperation of the surrendering state," and "preservation of the institution of extradition requires that the petitioning state live up to whatever promises it made in order to obtain extradition." *United States v. Najohn*, 785 F.2d 1420, 1422 (9th Cir.

1986) (per curium). Because the Rule of Specialty is based on comity, "its protection exists only to the extent that the surrendering country wishes." *Id.* Thus, an "extradited party may be tried for a crime other than that for which he was surrendered if the asylum country consents." *Id.* (citation, internal quotation marks, and emphasis omitted).

As a threshold matter, however, in order for the Rule of Specialty to apply, the criminal defendant must be involved in extradition proceedings. *United States v. Valot*, 625 F.2d 308, 310 (9th Cir. 1980). The Ninth Circuit has clarified that: "Neither deportation nor surrender other than in the response to a demand pursuant to Treaty constitutes extradition." *Oen Yin-Choy v. Robinson*, 858 F.2d 1400, 1404 (9th Cir. 1988). Thus, where "no demand for extradition is made by the United States and the defendant is deported by the authorities of the other country which is party to the treaty, no 'extradition' has occurred and failure to comply with the extradition treaty does not bar prosecution." *Valot*, 625 F.2d at 310; *see also United States v. Liersch*, No. 04CR2521, 2006 WL 6469421, at *7 (S.D. Cal. June 26, 2006) (holding that where Guatemalan officials handed a defendant over to the United States without the United States government making a formal demand for extradition, no Treaty was violated and cannot bar prosecution).

McVicker alleges that the charges against him should be dismissed because he was removed from Belize and returned to the United States based on an indictment and arrest warrant that, three months later, was materially changed and expanded. McVicker's argument is unavailing. On March 23, 2011, six days after his arrest, McVicker was ordered out of the country as a "prohibited immigrant" under the immigration law of Belize. Gov't Ex. 5. The government contends that no formal extradition request was made that would trigger the requirements within the extradition treaty between Belize and the United States. Based on the

evidence presented, the Court agrees. *See Valot*, 625 F.2d at 309 (holding there is no extradition where foreign officials voluntarily turn a criminal defendant over to United States officials).

Because the Rule of Specialty and international comity principles do not apply in this case, the Court denies McVicker's motion.

### D.  Motion to Suppress Statements of Defendant

McVicker moves to suppress all statements made by him and all evidence derived from those statements. First, McVicker argues that there was a joint venture between the United States officials and the police officers from Belize who were holding McVicker. Because the Belizean police officers interrogated McVicker before he was given any *Miranda* warnings, McVicker contends that these pre-*Miranda* interrogations conducted by the Belizean police officers render his post-*Miranda* statements involuntary. Second, McVicker argues that his statements were coerced and thus involuntary and should be suppressed. McVicker's arguments are unavailing and his motion is denied.

The government bears the burden of proving by a preponderance of the evidence that McVicker knowingly, intelligently, and voluntarily waived his *Miranda* rights. *See Missouri v. Seibert*, 542 U.S. 600, 608 n.1 (2004) (providing that the government bears the burden of proving both a valid *Miranda* waiver and that a criminal defendant's statements were voluntary). Even where the requirements of *Miranda* are satisfied, the Court must assess the voluntariness of an admission under the "'totality of all the circumstances—both the characteristics of the accused and the details of the interrogation.'" *Mickey v. Ayers*, 606 F.3d 1223, 1233 (9th Cir. 2010) (citing *Dickerson v. United States*, 530 U.S. 428, 434 (2000)). An involuntary confession violates the Due Process Clause of the United States Constitution and is inadmissible. *See Colorado v. Connelly*, 479 U.S. 157, 168 (1986).

### 1. Joint Venture and Mid-Stream *Miranda* Warning

On March 17, 2011, Belizean police officers arrested McVicker in the presence of United States Embassy officials. Shortly after the arrest, Belizean officers searched McVicker's room on Long Caye and seized his passport, camera, and computer data memory stick. McVicker argues that while he was in the custody of and interrogated by the Belizean authorities *Miranda* warnings were not administered. *Miranda* warnings were given to McVicker on March 21, 2011, before the United States federal agents' interrogation of McVicker. McVicker contends that there was a joint venture between the United States and Belize and, thus, the March 21, 2011 *Miranda* warning was a "mid-stream" warning that requires the Court to suppress all subsequent statements.

### a. Legal Standards

#### i. Application of the exclusionary rule to foreign conduct

Generally, the exclusionary rule does not apply to searches conducted by foreign authorities in their own countries. *See United States v. Rose*, 570 F.2d 1358, 1361 (9th Cir. 1978). Further, statements obtained by foreign police in the absence of *Miranda* warnings are usually admissible in proceedings in the United States. *United States v. Covington*, 783 F.2d 1052, 1056 (9th Cir. 1985).

The Ninth Circuit, however, has recognized two limited exceptions to the general rule that United States Constitutional protections are inapplicable to actions of foreign agents conducted in foreign countries. The first exception arises "if the circumstances of the foreign search and seizure are so extreme that they shock the judicial conscience." *United States v. LaChapelle*, 869 F.2d 488, 490 (9th Cir. 1989). This exclusion is grounded in recognition that a court may employ its "supervisory powers when absolutely necessary to preserve the integrity of the criminal justice system." *United States v. Barona*, 56 F.3d 1087, 1091 (9th Cir. 1995). The

second exception applies when "United States agents' participation in the investigation is so substantial that the action is a joint venture between United States and foreign officials." *Id.* (quoting *United States v. Peterson*, 812 F.2d 486, 490 (1987)).

The question of whether there is a joint venture in a particular case requires the district court to "scrutinize the attendant facts." *Rose*, 570 F.2d at 1362 (quoting *Byars v. United States*, 273 U.S. 28, 32 (1927)). The mere presence of a United States official during the interrogation of an American citizen is not sufficient to prove a joint venture. *See Pfeifer v. U.S. Bureau of Prisons*, 615 F.2d 873, 877 (9th Cir. 1980). Further, the fact that the United States provides information to a foreign official that leads to a search does not, by itself, render that investigation a joint venture. *See Stonehill v. United States*, 405 F.2d 738, 741 (9th Cir. 1968), *cert. denied*, 395 U.S. 960 (1969); *see also Barona*, 56 F.3d at 1096 (finding that the United States requesting that Italian police put a "watch" on two suspects did not create a joint venture). In short, where there is only minimal or limited interaction, there is no joint venture. *See United States v. Schmidt*, 573 F.2d 1057, 1063 (9th Cir. 1978) (holding there was no joint venture because each relevant agency undertook separate investigations and there was only minimal interaction); *United States v. Mahar*, 645 F.2d 780, 782-83 (9th Cir. 1981) (holding there was no joint venture because the American officials did not participate in the alleged wiretap and the Canadian police were not acting as agents for their American counterparts).

### ii.  Mid-stream *Miranda w*arning

Prosecutors may not use statements stemming from custodial interrogation unless the defendant has been advised of his rights to remain silent and to have counsel present. *Miranda v. Arizona*, 384 U.S. 436, 444 (1966). Interrogation includes "either express questioning or its functional equivalent," meaning "any words or actions on the part of the police (other than those *normally attendant to arrest and custody*) that the police should know are reasonably likely to

elicit an incriminating response from the suspect." *Rhode Island v. Innis*, 446 U.S. 291, 300-01 (1980) (emphasis added). The test is an objective one; the subjective intent of the police is relevant, but not conclusive. *See United States v. Booth*, 669 F.2d 1231, 1238 (9th Cir. 1981).

Generally, statements made after mid-interrogation warnings should only be suppressed if the post-warning waiver was not knowingly or voluntarily made. *See Oregon v. Elstad*, 470 U.S. 298, 309 (1985). This general rule fails, however, where a law enforcement officer engages in "a deliberate two-step interrogation," which occurs when an officer interrogates a defendant in custody but does not warn the suspect of his *Miranda* rights until after he has made an inculpatory statement. *United States v. Williams*, 435 F.3d 1148, 1150 (9th Cir. 2006) (citing *Missouri v. Seibert*, 542 U.S. 600, 615 (2004)). In addressing this issue, a court should "consider whether objective evidence and any available subjective evidence, such as an [agent's] testimony, support an inference that the two-step interrogation procedure was used to undermine the *Miranda* warning." *Id.* at 1158. If a government agent "deliberately employed the two-step strategy," then a court will "evaluate the effectiveness of the midstream *Miranda* warning to determine whether the postwarning statement is admissible." *Id.* at 1160 (citing *Seibert*, 542 U.S. at 615).[10]

### b. The Exclusionary Rule is Not Applicable to the Actions of the Belizean Officers Under Either Relevant Exception

There is insufficient evidence in this case to support the application of either exception to the general rule that the exclusionary rule does not apply to foreign searches and seizures.

---

[10] Where there is a mid-stream *Miranda* warning, *Williams* counsels a court to evaluate the mid-stream warnings under the following framework: (1) the completeness and detail of the pre-warning interrogation; (2) the overlapping content of the two rounds of interrogation; (3) the timing and circumstances of the interrogations; (4) the continuity of police personnel; (5) the extent to which the interrogator's questions treated the second round as continuous with the first; and (6) whether any curative measures were taken. *Williams*, 435 F.3d at 1160.

First, the Court does not find that the circumstances of the foreign search and seizure in this case were so extreme so as to "shock the judicial conscience." *See LaChapelle*, 869 F.2d at 490. McVicker argues that he was interrogated by the Belizean police without receiving a *Miranda* warning. Dkt. 50. McVicker fails to demonstrate how the Belizean officials' failure to give him a *Miranda* warning was such a gross "deviation from American constitutional norms" to warrant suppression. *LaChapelle*, 869 F.2d at 490. Although suppression may be warranted in a case where United States officials are capitalizing on abusive foreign tactics as a part of an interrogation strategy, those facts are not present in this case. *See, e.g.*, Jenny Brooke-Condon, *Extraterritorial Interrogation: The Porous Border Between Torture and U.S. Criminal Trials*, 60 Rutgers L. Rev. 647 (2008). The Court may employ its supervisory power when "absolutely necessary to preserve the integrity of the criminal justice system." *Barona*, 56 F.3d at 1091. The failure of foreign authorities to provide a *Miranda* warning when conducting an investigation outside the presence of United States officials does not require judicial intervention. Further, although the Belizean police independently interrogated McVicker after his arrest on Long Caye without providing him with a *Miranda* warning, there is no evidence that the substance of this interrogation was provided to or used by the United States government.

Second, the Court does not find that there was joint venture between the United States and Belize. McVicker argues that his arrest on Long Caye was a joint venture between Belizean police and the officers of the Diplomatic Security Service of the United States Embassy. Specifically, he argues that Agent Trachtenberg, in the presence of the Belizean police officers, asked McVicker if he was "Kenny" and where he was residing. The Belizean police officers conducted a search of the room in which McVicker was staying on Long Caye, where his passport, camera, and a computer data memory stick were seized. McVicker was then taken to

the Belize City Jail where he was questioned by Belizean police officers, outside the presence of federal agents, without first receiving a *Miranda* warning.

The conduct of the Belizean police and the United States officials in this case does not fall within the joint venture exception. The government argues that Agent Trachtenberg's involvement at the time of McVicker's arrest was to determine the identity of McVicker and the location where he was staying. Although Agent Trachtenberg was present at the time of McVicker's arrest, it was Belizean officials who arrested and detained McVicker on alleged immigration violations.

Further, Agent Trachtenberg was not present when the Belizean police interviewed McVicker on the date of his arrest, and the United States has no knowledge of the substance of the interview. The interrogation conducted by United States officials on March 21, 2011, was independent of the Belizean police officials' investigation. In short, there is no evidence that federal agents were involved in initiating or controlling the March 17, 2011, investigation or interrogation. *See LaChapelle*, 869 F.2d at 489-90 (holding that the district court did not err in crediting the testimony of a foreign official that "stated explicitly at the suppression hearing that Americans were not involved in initiating or controlling" an investigation); *see also Mahar*, 645 F.2d at 783 (holding there was no joint venture where the investigation of the defendant "was initiated and controlled by Canadian police, with only limited support and assistance from American officials on this side of the border").

Further, the ultimate decision of when to arrest McVicker and subsequently expel McVicker from Belize was made by Belizean officials. The Court is not persuaded that the Belizean officials' parallel execution of an INTERPOL "Red Notice" arrest is sufficient to establish that there was "substantial involvement" between the United States and Belize

governments under the joint venture doctrine. Nor is the fact that the United States requested or executed a warrant through INTERPOL. The Court takes judicial notice, without objection of the parties, that Belize is and has been a member country of INTERPOL since November 23, 1987. As such, Belize can act on a "Red Notice" issued by a member country "with a view to extradition or other similar lawful action." *See* Notices: Types of Notices, *available at* http://www.interpol.int/layout/set/print/Interpol-expertise/Notices.

In short, indirect involvement of United States law enforcement agents in the arrest of McVicker does not give rise to a joint venture. *See Pfeifer*, 615 F.2d at 877. Instead, there must be "coordination and direction of an investigation or interrogation." *United States v. Abu Ali*, 528 F.3d 210, 229 (4th Cir. 2008). As noted in *Pfeifer*, the United States' participation in a treaty that encourages a foreign country to arrest United States citizens who violate its laws is insufficient to invoke the joint venture doctrine. 615 F.2d at 877. With respect to extradition procedures:

> [E]vidence that the United States may have solicited the assistance of a foreign government in the arrest of a fugitive within its borders is insufficient as a matter of law to constitute United States participation under the joint venture doctrine . . . United States law enforcement officers are not required to "monitor the conduct" of foreign officials who execute a request for extradition or expulsion.

*United States v. Yousef*, 327 F.3d 56, 146 (2d Cir. 2003) (quoting *United States v. Lira*, 515 F.2d 68, 71 (2d Cir. 1975)). Although the United States requested the Belize government's assistance through INTERPOL, testimony from Agent Trachtenberg indicates that the United States federal officials did not have control over the timing or conditions of McVicker's arrest or the ultimate order to leave Belize issued by Belizean officials on March 23, 2011. Thus, the United States' request to Belize for McVicker's arrest is not, alone, sufficient to invoke the joint venture doctrine. *See United States v. Straker*, 596 F. Supp. 2d 80, 106-07 (D.D.C. 2009) (finding there

was no joint venture where a criminal defendant was arrested by Trinidad officials and the

United States and Trinidad officials conducted separate investigations).

The cases cited by McVicker regarding suppression under the joint venture doctrine

support the Court's ruling. In *Stonehill*, the court determined that federal officers were not in a

joint venture with Philippine officials. 405 F.2d at 746. The court reasoned that the search was

not a joint venture because: (1) the raids were planned by Philippine officers for the purpose of

obtaining evidence for Philippine proceedings before the United States agents became involved;

(2) the United States agents were given permission to copy documents only after the raids were

completed; and (3) the United States had only made information available to Philippine officials

without requesting action. *Id.* Beyond McVicker's assertion to the contrary, there is no evidence

in the record that United States federal authorities collaborated, directed, or were even given

access to the information obtained during the March 17, 2011, Belizean-led interrogation. The

actions in this case are similar to the facts in *Stonehill*—Agent Trachtenberg was merely present

at the time of the arrest, the federal agents have been given access to evidence seized after the

search, and the Belizean authorities were pursuing an independent investigation of McVicker.

Comparing the case of *United States v. Emery*, 591 F.2d 1266, 1268 (9th Cir. 1978), with

the present action is also instructive. In *Emery*, the court found that in one of the specific

investigations under review, there was a joint venture between United States and Mexican

authorities. The court found that the United States was substantially involved in the investigation

because the D.E.A. agents alerted the Mexican police of possible illegal activity, coordinated the

surveillance of airports, supplied the pilot for the plane trafficking drugs, and then gave the

signal for an arrest after it was determined that a suspect possessed illegal substances. *Id.* As

compared to McVicker's arrest, there is no evidence that Agent Trachtenberg alerted the

Belizean police or directed any of their activities. McVicker alludes to a possible coordinated investigation, but the Court has already determined that the government's assertions to the contrary are credible. *See LaChapelle*, 869 F.2d at 489-90. The mere presence of a diplomatic officer of the United States during an interrogation, or even an arrest, is not sufficient to prove a joint venture. *See, e.g.*, *Pfeifer*, 615 F.2d at 877.

### c. McVicker's *Miranda* Warning on March 21, 2011 was Adequate

Whether McVicker was subject to a two-step interrogation depends on whether there was a joint venture between the United States and Belizean authorities. As discussed above, there is insufficient evidence to prove that the Belizean police were acting as proxies for the United States. Because it is inappropriate to impute the Belizean-led interrogation to the United States, there was not a mid-stream *Miranda* warning.

Further, Agent Trachtenberg's independent questioning of McVicker on March 17, 2011, at the time of McVicker's arrest did not require a *Miranda* warning. As previously explained, Agent Trachtenberg asked McVicker only whether he was "Kenny" and where he was staying. Dkt. 57 at 5. Pursuant to *Innis*, law enforcement officers may ask questions that are attendant to arrest and custody without triggering the requirements of *Miranda*. *See* 446 U.S. at 300-01. The Ninth Circuit has held, for example, that "routine gathering of background biographical information, such as identity, age, and address, usually does not constitute interrogation." *United States v. Washington*, 462 F.3d 1124, 1132 (9th Cir. 2006). In addition, "[q]uestions about a person's identity are not unconstitutional even if identification of the person may help lead to the prosecution of that person for a crime." *Id.* at 1133. Asking for McVicker's name and where he was staying was attendant to his arrest and custody and did not require a *Miranda* warning. *See Innis*, 446 U.S. at 301; *see also Booth*, 669 F.2d at 1238 (holding that questions relating to a defendant's identity and age were not likely to elicit an incriminating response).

PAGE 37 – OPINION AND ORDER

In addition, prosecutors may use the physical fruits of a statement obtained in violation of *Miranda* unless the statement was "actually coerced." *United States v. Patane*, 542 U.S. 630, 636 (2004). "The test for determining whether a confession is voluntary is 'whether, consider the totality of the circumstances, the government obtained the statement by physical or psychological coercion or by improper inducement so that the suspect's will was overborne.'" *United States v. Fisher*, 137 F.3d 1158, 1165 (9th Cir. 1998). The exclusionary rule also does not apply to evidence that "ultimately or inevitably would have been discovered by lawful means." *Nix v. Williams*, 467 U.S. 431, 444 (1984). Importantly, the United States is not relying on evidence that was obtained as a result of the questioning on March 17, 2011. There is also no indication that at the time Agent Trachtenberg asked his two questions McVicker was subject to any physical or psychological threats or pressure. Without evidence of such coercion, the physical evidence seized as a result of those statements is admissible. *Cf. Fisher*, 137 F.3d at 1165.

### 2. Voluntary Confession on March 21, 2011

McVicker argues that his statements made during the March 21, 2011 interrogation were involuntary because they were obtained as a result of McVicker's belief that it was the only way to be extricated from the conditions of his confinement in Belize. McVicker argues that Agents Findley and Mooney "bracketed their comments by alluding to the circumstances of McVicker's confinement." Dkt. 50 at 14. McVicker contends that the "clear import of their statements . . . was that his cooperation with them would permit him to be transferred out of the Belize City Jail." *Id.* Conversely, McVicker argues, unless he agreed to speak with the United States agents, he would remain in Belize jail. *Id.* Because McVicker's statements to the agents were freely and voluntarily made and not the subject of police coercion, the statements need not be suppressed. *See Colorado v. Connelly*, 479 U.S. 157, 163, 167 (1986).

### a. Legal Standards

A statement from an accused defendant is admissible in evidence only if it was freely and voluntarily made. *Connelly*, 479 U.S. at 163. Involuntary confessions violate due process. *Id.* An inculpatory statement must be the product of both a rational intellect and a free will. *Blackburn v. Alabama*, 361 U.S. 199, 208 (1960). The government bears the burden of proving voluntariness by a preponderance of the evidence. *United States v. Leon Guerrero*, 847 F.2d 1363, 1365 (9th Cir. 1988).

"[C]oercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the Due Process Clause." *Connelly*, 479 U.S. at 167; *see also United States v. Preston*, 706 F.3d 1106, 1113 (9th Cir. 2012). Generally encouraging a criminal defendant to tell the truth does not amount to police coercion. *Amaya-Ruiz v. Stewart*, 121 F.3d 486, 494 (9th Cir. 1997). Police deception alone "does not render [a] confession involuntary," *United States v. Miller*, 984 F.2d 1028, 1031 (9th Cir. 1993), nor is it coercive to recite potential penalties or sentences, including the potential penalties for lying to the interviewer, *United States v. Haswood*, 350 F.3d 1024, 1029 (9th Cir. 2003); *see also United States v. Bautista-Avila*, 6 F.3d 1360, 1364-65 (9th Cir. 1993). An interrogating agent's promise to inform the government prosecutor about a suspect's cooperation does not render a subsequent statement involuntary, even when it is accompanied by a promise to recommend leniency or speculation that cooperation will have a positive effect. *See Leon Guerrero*, 847 F.2d at 1366.

The test for determining the voluntariness of a suspect's confession is whether, under the totality of the circumstances, the government obtained the statement by physical or psychological coercion or by inducement, such that the suspect's will was overcome. *See United States v. Coutchavlis*, 260 F.3d 1149, 1158 (9th Cir. 2001) (citing *Haynes v. Washington*, 373 U.S. 503, 513-14 (1963)). The court should consider various circumstances, including: (1)

whether there was police coercion; (2) the length of the interrogation, its location, and its continuity; (3) whether police advised the suspect of his rights; and (4) whether there were any direct or implied promises of a benefit. *Clark v. Murphy*, 331 F.3d 1062, 1072 (9th Cir. 2003). Courts should also consider defendant's age and education, the nature of the questioning, and the use or threat of physical punishment. *See Haswood*, 350 F.3d at 1027 (citing *Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973)). A defendant's waiver of his *Miranda* rights is also a significant factor in the totality of the circumstances analysis, but does not render moot the voluntariness inquiry. *See Dickerson*, 530 U.S. at 433-34.

### b. McVicker's Statements Were Voluntary

The crux of McVicker's argument is that Agents Findley and Mooney used the conditions of McVicker's confinement in the Belize City Jail to convey the impression that the only way out of his foreign captivity would be to waive his right to remain silent. In essence, McVicker contends that the federal agents implied a *quid pro quo*—namely, if McVicker waives his Fifth Amendment rights and speaks with the agents, then the agents would assist McVicker in getting out of Belize, but not otherwise.

McVicker's situation must be viewed under the totality of the circumstances. *Clark*, 331 F.3d at 1072. Under the factors outlined in *Clark* and for the reasons discussed below, the Court finds insufficient evidence that McVicker's statements were not voluntary. *Id.*

The federal agents did not create a "coercive atmosphere." McVicker chose to travel to Belize before any agents arrived, and after they arrived they accurately described McVicker's situation. The interview began, before McVicker received his *Miranda* warning, with Agent Findley telling McVicker: "[Agent Mooney] and I both work for the U.S. Department of Homeland Security. We're down here in Belize to—we're told we are to come talk to you and we're going to have to make some decisions about where you go from here and what happens.

You've been told that there is an arrest warrant for you in the U.S.?" Gov't Ex. 2 at 1. After McVicker received his *Miranda* warning, *id.* at 1-2, he asked whether there was an attorney available to him in Belize. The federal agents accurately made clear to McVicker that they "don't have any authority under the laws here in Belize to provide you an attorney or anything like that." *Id.* at 2. McVicker told the federal agents that he had been detained for "four or five days now" and that he had not yet been charged. *Id.* at 2. He further told the federal agents about his limited access to a bathroom and shower and stated that they "probably like it I'm in this situation." *Id.* The agents responded that it was "not [their] goal at all" to put him in the Belize City Jail conditions and that they did not have the "authority or ability to force them to treat [McVicker] any differently than they would any other citizen." Gov't Ex. 2 at 2.

There is no evidence that federal officials had control over the conditions of McVicker's confinement in the Belize City Jail. Thus, evidence of the conditions of McVicker's confinement alone does not establish police coercion. *See United States v. Shi*, 525 F.3d 709, 728 (9th Cir. 2008) (holding that a criminal defendant, after being held for four days in the storage compartment on a ship, was not subjected to police coercion because the defendant was not under government authority). Similarly, there is no evidence that the federal agents, while they were interviewing McVicker or transporting him back the United States, intimidated or coerced McVicker in any way. *Cf. Shi*, 525 F.3d at 728. Pursuant to *Connelly*, there must be "some causal connection" between police conduct and a defendant's statement to render it involuntary. 479 U.S. at 167.

The agents' statements during the March 21, 2011, interview also are insufficient to show any *quid pro quo* or otherwise establish that McVicker's statements were involuntary. The agents' accurately explained why they were talking to McVicker and the lack of control they had

over his imprisonment in Belize. They added that cooperation could be beneficial to McVicker. The agents' statements do not amount to a coercive promise or threat or even an implied promise or threat. *See Leon Guerrero*, 847 F.2d at 1366 (holding that speculation that cooperation will have a positive effect does not render a subsequent statement involuntary); *see also United States v. Harrison*, 34 F.3d 886, 891 (9th Cir. 1994) (reasoning that a statement that a defendant will receive a benefit upon cooperation is permissible speculation and in most circumstances will not be "sufficiently compelling to overbear a defendant's will"). The testimony from Agent Findley established that the United States agents were attempting to determine which foreign government would have primary jurisdiction or whose law enforcement actions would take "precedence" over McVicker, and that by understanding the facts more completely, the agents might be able to get McVicker to the United States more quickly. This is conclusion is corroborated by the March 21, 2011, interview transcript, where Agent Findley explained to McVicker:

| | |
|---|---|
| SA Findley: | . . . I know that there is some *interest by the authorities in Ecuador*. I don't know if there is any *further interest in the authorities here in Belize*, but decisions are going to have to be made as to *who takes precedence* and all those things. Does that make sense? |
| McVicker: | Yes. |
| SA Findley: | So we'd like to talk to you and we'd like to get you back to the U.S. or whatever. You would get a shower and get to go back to the bathroom, in a toilet by yourself and stuff like that. So our goal is to get you—to get you back there. If you want to talk to us today and we'll figure out why you're here and hopefully we can make that happen. Okay? |

Gov't Ex. 2 at 2 (emphasis added). This realistic assessment of the potentially competing jurisdictional claims, or issue of precedence, among the United States, Belize, and Ecuador is not

an express or implied promise or threat. Merely discussing the potential benefits of cooperation fails to create an unduly coercive environment. *See Harrison*, 34 F.3d at 891.

Moreover, the Ninth Circuit in *United States v. Bautista-Avila* analyzed whether a defendant's confession was coerced by admonitions regarding the integrity of the United States judicial system. 6 F.3d 1360, 1365 (9th Cir. 1993). In particular, evidence indicated that a federal agent told Armenta-Estrada that "in the United States, as opposed to Mexico, 'judges and attorneys could not be bribed and the charges could not be and would not be dropped.'" *Id.* at 1365 n.5. The court held that such a statement was not "sufficiently compelling to overbear [the defendant's] free will and rational intellect." *Id.* (citing *Leon Guerrero*, 847 F.2d at 1367).

Here, the federal agents noted the treatment given to criminal defendants in the United States. This realistic assessment of the integrity and liberty within the United States' justice system is not in itself coercive. More to the point, the federal agents did not threaten, even impliedly, to withhold this benefit from McVicker—instead they noted that talking to them would help them figure out why McVicker was still in Belize and help get him back to the United States. Gov't Ex. 2 at 2. In addition, although McVicker testified at the evidentiary hearing on October 22, 2013, he never claimed that he had interpreted the agents' statements as a promise, threat, or *quid pro quo*, express or implied. In fact, McVicker's testimony supported Agent Findley's testimony about the issue concerning which country's law and prosecution might take precedence. During the evidentiary hearing, McVicker described that Belizean police had recently questioned him about whether he had sexually abused any children in Belize.

As explained in *Harrison*, statements to a defendant of a benefit stemming from cooperation, versus a threat to withhold a benefit, are in many ways "different sides of the same coin." 34 F.3d at 891. Such statements, however, "are not entirely interchangeable," and

"speculation that cooperation will benefit a defendant . . . [is not] sufficiently compelling to overbear a defendant's will." *Id.*

Several other exchanges between McVicker and the United States agents are informative. Shortly after receiving his *Miranda* warning, McVicker stated:

> McVicker: So it's kind of strange, though, because they have a sign on the wall that says that if anyone has to be detained under their system and you must be brought up on charges—you must be charged within 48 hours. I've been in this rat hole for four or five days now. I haven't had a shower. I went to the bathroom one time. They let me go to the bathroom one time. You can see I haven't shaved. I'm smelly. I don't know. I mean, you guys probably like it I'm in this situation.
>
> SA Findley: Not at all. That's not our goal at all. But we do have to make the—we don't have the ability to arrest, detain, or do anything with you in Belize, nor do we have the authority or the ability to force them to treat you any differently than they would any other citizen.

Agent Findley made clear to McVicker, after giving him his *Miranda* warnings, that he was "in custody on immigration violations in Belize." Gov't Ex. 2 at 2. After the exchange quoted above, McVicker requested that a Belizean jail official, who was in the interview room with McVicker and the federal agents, leave. *Id.* at 3. The federal agents asked the Belizean official leave to the room, and he appears to have done so. *Id.* The exchange that followed between McVicker and the federal agents after the Belizean official left the room further demonstrates that the federal agents were not threatening McVicker with the conditions of the Belize City Jail or the prospect of future imprisonment in Belize:

> McVicker: I'm in a really terrible rat hole there and everybody there thinks that I'm there for being in the country illegally.
>
> SA Findley: OK.

PAGE 44 – OPINION AND ORDER

| | |
|---|---|
| McVicker: | because I was working on a tourist visa. |
| SA Findley: | Right. |
| McVicker: | But I just worry about [0:05:51.8 INAUDIBLE] |
| SA Findley: | Yeah. Again, our—believe me Kenny, we don't want anything bad to happen to you in this facility or in any other facility. Umm…Like I said, we believe very strongly in the American way of justice and that is to treat people fairly and with respect to everybody. So we're not looking to put you in a worse situation than you already are. |

Gov't Ex. 2 at 3-4.

Further, toward the end of the interview, the following exchange took place:

| | |
|---|---|
| SA Findley: | Is there anything that Jim [Special Agent Mooney] or I or Paul [Special Agent Trachtenberg] today has done to offend you or make you uncomfortable or threatened in any way? |
| McVicker: | No |

Gov't Ex. 2 at 44.

Two district court cases outside of this circuit, but consistent with Ninth Circuit precedent, are illuminating on permissible interrogation tactics with criminal defendants abroad. In *United States v. Bout*, the court utilized a totality of the circumstance test to determine whether a criminal defendant's confession was involuntary. No. 08 CR 365(SAS), 2011 WL 4389537, at *3-4 (S.D.N.Y. Aug. 25, 2011). The court made various findings demonstrating the defendant's statement to American agents were not voluntary, including: (1) that the defendant had requested counsel and the opportunity to speak with his embassy; (2) the arrest was dramatic, included a strip search, a non-consensual search, and exposure to a large number of reporters and photographers on the defendant's way to Thai police headquarters; (3) the defendant told the Thai police that he did not want to speak with the Americans; (4) the defendant was questioned in English, which was not his native language; and (5) the defendant

PAGE 45 – OPINION AND ORDER

was told by the Americans, after being in Thai police custody for a few hours, that he would face "not 'particularly pleasant' conditions including . . . 'heat, hunger, disease, and rape'" and that this was his last chance to speak with them. *Id.* The court reasoned that this was a credible threat of violence that coerced the defendant and lead the defendant to believe that speaking with the American agents was the only way to escape the rough conditions of a Thai jail. *Id.* at *4.

The facts in evidence in this case are distinguishable from *Bout*. McVicker did not unequivocally invoke his right to an attorney. *See Miranda*, 384 U.S. at 469 ("[T]he right to have counsel present at the interrogation is indispensable to the protection of the Fifth Amendment privilege."); *Davis v. United States*, 512 U.S. 452, 460 (1994) (holding that a request for an attorney that is equivocal and ambiguous does not require the cessation of questioning or clarifying questions). The interview occurred independently of the Belizean police's arrest of McVicker. Additionally, the arrest in this case was significantly less "dramatic" than the arrest in *Bout*. At no point did McVicker refuse to speak with the federal agents, and he conversed with them in his native language.

Finally, and most importantly, the only instances where conditions of the Belize City Jail or Belize prisons were mentioned was by McVicker himself. It appears that McVicker had independent knowledge from persons other than United States agents or officials about the conditions of the Belize prison where he might be sent, but at no point was any mention made by the federal agents of any potential violence against McVicker. *See, e.g.*, *Arizona v. Fulminante*, 499 U.S. 279, 287 (1991) (holding that the defendant's confession made to a paid government informant while both were incarcerated was coerced where informant described his willingness to help protect the defendant from physical violence by other prisoners if the defendant confessed); *Payne v. Arkansas*, 356 U.S. 560, 561 (1958) (holding that a confession was coerced

PAGE 46 – OPINION AND ORDER

because the interrogating police officer had promised that if the accused confessed, the officer

would protect the accused from an angry mob outside the jailhouse door). In McVicker's

situation, the federal agents did not offer McVicker protection within the Belize City Jail and

make it clear that they had no control over the conditions in that jail. Gov't Ex. 2 at 2-4. Thus,

the federal agents' communication to McVicker falls short of constituting coercion through an

implied threat of physical harm.

In contrast to *Bout*, in *United States v. Dominguez-Gabriel*, the court denied a

suppression motion under the totality of the circumstances where the defendant was told of the

possibility that he would be extradited from the United States to Mexico, where prison

conditions would be harsh and dangerous. No. 09 Cr. 157, 2010 WL 1915044, at *8 (S.D.N.Y.

May 12, 2010). In *Dominguez-Gabriel*, the federal agents merely informed the defendant of the

possibility of being extradited, not that it would necessarily happen without his cooperation. *Id*.

In McVicker's case, he was told of the possibility of being prosecuted in the United States where

he would be afforded greater rights and liberties. Gov't Ex. 2 at 2. Although McVicker argues

this is nothing more than a veiled threat, under the applicable precedent there is a meaningful

distinction. *See Harrison*, 34 F.3d at 891 (statements to a defendant of a benefit from cooperation

versus a threat to withhold a benefit "are not entirely interchangeable" and "speculation that

cooperation will benefit a defendant . . . [is not] sufficiently compelling to overbear a defendant's

will"). Thus, McVicker's subsequent statements to the federal agents were voluntary and the

product of his free will.

In sum, McVicker was not coerced by Special Agents Mooney and Findley when they

accurately and realistically described to McVicker his situation and their goal to remove him

from the Belize City Jail. The agents' actions, when considered under the totality of the

circumstances, do not give rise to creating a coercive environment that would render McVicker's statements coerced and involuntary. Thus, McVicker's motion to suppress the statements made on March 21, 2013, is denied.

**CONCLUSION**

McVicker's Motion to Suppress Statements of Defendant (Dkt. 50) is **DENIED**; McVicker's Motion to Dismiss Superseding Indictment for Defective Jurisdiction (Dkt. 52) is **DENIED**; McVicker's Motion to Dismiss for Lack of Venue (Dkt. 54) is **DENIED**; and McVicker's Amended Motion to Dismiss Case for Violation of the Rule of Specialty (Dkt. 103) is **DENIED**.

**IT IS SO ORDERED**.

DATED this 23rd day of October, 2013.

/s/ Michael H. Simon
Michael H. Simon
United States District Judge